Thank you, Your Honor. No, Mr. Rice wins in this case, but it's because it's important to get to the right starting point. Pardon me. Even though... This is not a jury. I understand, Your Honor. Even though the guidelines are advisory at this point and the district court did recognize that the guidelines were advisory on the second opportunity for resentencing, it's still important that the district court find the correct starting point under the guidelines under Manyweather and under Cantrell. In this case, the guideline starting point was incorrectly established, we think, for three reasons. One, the weight of the ecstasy, the dose weight was incorrectly calculated. The amount of pills, the number of pills that were attributed to Mr. Rice was incorrect, and also the role in the offense was incorrect, Your Honor. There's no argument in this case that the actual weight could never be established. No pills over this historic conspiracy were ever obtained. The only time that the DEA had an opportunity to obtain pills, it was from Mr. Pollack and it was after the time in which Mr. Rice was involved. So there's no actual weights or true weight from a pill that the DEA found. In that case, Mr. Rice argued to the district court, the court should apply the guidelines tables. The equivalency, which sets out how many grams of ecstasy is equal to how many grams of marijuana, and more importantly, what that weight of that each tablet pill should be. There was no dose weight for ecstasy in the guidelines, right? There's no dose weight for MDMA. There was dose weight for MDA. Those are very similar, but not exactly the same. That's correct, Your Honor. In this case, when you track how MDA is established in the guidelines, and then look at how MDMA is established, they track almost identically, except MDA gets a head start. There was some DEA testimony about typical weight, wasn't there? There was, Your Honor. There was testimony that was presented to the United States Sentencing Commission when the Sentencing Commission was looking at the May 2001 emergency guidelines. That was to establish, and what came out of that was the new equivalency weight. Instead of having the equivalency weight at 35 grams of marijuana, it's now bumped up to 500 grams of marijuana. Why couldn't the district court, or I mean, could the district court consider that testimony as relevant to the weight before the new guidelines went into effect? No, because the argument that was made at the district court level was to apply the amendment, including that underlying assumption that somehow MDMA should have a higher dose weight than MDA would be an ex post facto application of the guidelines. When you look at how the district court answers the question later in the request for resentencing that occurred just in 2005, the court specifically says in its order denying a resentencing, and oh by the way, I was right because look, they applied the new 250 milligrams. They applied it in the new guidelines, but if the court said I'm applying the old guidelines and they have a blank or a gap, why is it improper for the court to consider the DEA testimony? Because the argument surrounding that testimony was focused on the ex post facto argument. Whether or not that 2001 emergency amendment was going to apply, no one, not the government in their arguments to the district court, not the pre-sentence investigator, not the court identified that DEA report that is included in footnote 56. This is in exhibit F to the government's objections to the PSI calculations, so it's early in the proceedings. It's one of six exhibits and it's one footnote that the DEA presented testimony to the United States Sentencing Commission in support of the 2001 emergency amendment. No one was under the impression that we were arguing about the fact of, there may be a fact of 250 is a correct weight. We all thought we were arguing about the ex post facto application of the guidelines. Okay. Now you're saying that's what the counsel were thinking, but I thought that the judge made clear that what he felt he was doing was looking at the testimony and applying it to the older guidelines to fill in a blank. I think, Your Honor, I would disagree. Maybe he's wrong, but that's how I read what he thought he was doing. I would disagree. If you look at Mr. Rice's sentencing particularly, he says, I'm relying upon the testimony to Congress, that report to Congress. Sometimes the court refers to it as a report to the Sentencing Commission, but he's really talking about that May 2001 report to Congress that the United States Sentencing Commission presents. And it's true. In that report, there is a section that outlines what the typical weight for MDMA is. The actual weight ran from 75 milligrams to 125 milligrams. The total weight with the carrier would be 250 milligrams to 300 milligrams. That was what we thought we were arguing about. And there is an inconsistency, I will agree with you there, between Mr. Nichols' sentencing that occurred only a few, about an hour before Mr. Rice's sentencing. In that one, he specifically refers to the DEA statement as a separate statement. But in ours, in Mr. Rice's argument, we're talking about the report to Congress. Okay, thank you. So that's why Mr. Rice wins on that issue. And also, I think it's important to point out that because there is this gap, we would naturally turn to the guidelines. There were two theories at the district court level. One is this one we just went over. But the second one was an analogous argument. If you look at MDMA and compare it to how MDA is and later how it's amended by the United States Sentencing Courts, it makes perfect sense to assume that MDMA would also track. And in fact, if you look from 2000 to the emergency in 2001 when MDMA first makes its appearance, it has equal equivalency to MDA. Then the next one, when the emergencies are put into final form in November, they remain consistent. And then in 2002, when the dose weight changes, then both are tracking similar exact weight, the exact dose, the exact equivalency weight. As to the others, the amount of pills established for Mr. Rice was a factual call. We think that the district court abuses discretion in that point and expanded it to four months instead of the three months that was argued because the court somehow went by – my argument is the court is going by whole months, December, January, February, March, when in fact there was testimony in the record that no one started at Mr. Rice's facility until shortly before December when the Grinch rave occurred. And he's evicted early in March. And then finally, the role in the offense, Your Honor, there has been – our argument is that the court got that one incorrect because Mr. Rice did not supervise anyone in this. He was – the theory the government advanced and the one that appears from Mr. Blair's testimony at trial, who was Mr. Rice's unindicted co-conspirator, he was the partner in the Mr. Rice's job was simply to ensure that the percentage for Mr. Blair and Mr. Rice was a – Oh, Rice owned the place, didn't he? Rice was leasing the place. That's correct. He was the owner in the sense that he was the lessee of the facility. And he, according to the government, decided who was going to run the drug operation there. He did not. I would disagree with that. What he decided was he would agree to arrange for the parties, for the raves to be there, and he would agree on how much he was going to get paid. But the business arrangement between Mr. Rice, Mr. Pollack, and Mr. Nichols was that they would be exclusive. That was not Mr. Rice's decision. He's just – in a sense, he's just making a business deal there, Your Honor. So I – if I could, I would like to reserve the remaining time. Great. Thank you. Thank you. Are you a CGA or retained? CGA, Your Honor. Thank you. We'll hear from the government at this time. Mr. Burrow? May it please the Court, I'm Alan Burrow, Assistant U.S. Attorney from Boise, Idaho. In this case, after the initial round of objections to the pre-sentence investigation report, that's when the ex post facto issue was raised. The pre-sentence investigator agreed with the defense on the ex post facto issue concerning which guidelines to apply. So that issue, they knew they already had the pre-sentence investigator on their side and a revised PSR had been issued. The issue then became, how does the district court count the amount of drugs? There was no further issue over which set of guidelines were to be applied. Mr. Rice filed some more objections to the new pre-sentence investigation report and in those objections stated the following, I quote, according to the DEA, the typical weight per dose of MDMA ecstasy is 100 milligrams. See attachment 1, DEA MDMA fact sheet printed March 23, 2003 and that fact sheet was attached. There was no issue before the district court over whether the court could legitimately consider information from the DEA. Both sides were arguing information from the DEA. The information being argued by Mr. Rice came two years after the offense conduct in this case. It was in March of 2003. The information relied on by the district court came out in testimony given before the sentencing commission on March 9, 2001 while the offense conduct was still ongoing. The question, the issue was dose weight or mixture weight, dose weight or pill weight. Both sides were arguing DEA information. The defense wanted the court to use the dose weight of the actual MDMA, 100 milligrams. The government and the court ultimately went this way, used the DEA information regarding total pill weight of MDMA ecstasy which was 250 milligrams up to 300 milligrams. That was the issue. There was no ex post facto issue regarding this. Both sides were arguing DEA information and the district court was opposed to just dose weight. The statute of conviction here under 21 U.S.C. Section 841 charges a mixture containing MDMA. Under this court's precedent in the Crowell case, under the United States Supreme Court precedent as well as the guidelines in the statute all require the drug amount to be factored or calculated on the basis of the entire weight of the entire pill and not just the dose weight of the control substance. The guidelines in effect at the time had a suggested dose weight for MDA ecstasy but it was only, again, it was dose weight. It wasn't mixture weight. Furthermore, MDA ecstasy and MDMA ecstasy, even though they're both called ecstasy, they're not equivalent substances. MDA ecstasy contains amphetamine. MDMA ecstasy, which was involved in this case, contains methamphetamine. They're not the same. If you look at the marijuana equivalencies under the guidelines in effect at the time, methamphetamine receives ten times the marijuana equivalency of amphetamine. The district court was absolutely correct here to rely on DEA information. That's where the drug equivalency table comes from anyway. It expressly says that it's based on DEA information. Both the parties were arguing DEA information to the court. Where the defense lost out was they could not convince the court to rely on simply dose weight as opposed to pill weight and the court was correct on that issue. The only ex post facto issue concerned whether to apply a later edition of the guidelines or the May 1, 2001 amendment to the guidelines, which greatly increased the marijuana equivalency of MDMA ecstasy. The court agreed with Mr. Rice on that point and as a result, his guidelines were essentially cut in half. His guidelines went from over 12 years down to just over six years. So this point that's being raised now before this court was never presented to the district court. The plain error standard should apply and the defendant has not shown any error, let alone plain error. Moving to the second point concerning the amount of pills calculated, the record here demonstrates that the district court was extremely conservative. The district court noted that there was evidence in the record showing that the defendant's participation in this conspiracy lasted for up to six months, if not longer, and that there were up to 8,000 ecstasy pills per month being used in the conspiracy. One of the trial witnesses, and the court summarized seven different trial witnesses in support of its findings, one of them recounted on a single occasion helping count out 25,000 ecstasy pills. That's almost twice as much as the entire amount the district court attributed to this defendant, and that's just one occasion. It easily supported over 8,000 pills per month. The district court was wanting to be very, very conservative, cut the time period of offense conduct from six months all the way back to four months, and then used a 4,000 pill per month figure. There was another witness in the case who was a co-defendant who pled guilty, who testified a conservative estimate was 4,000 pills per month. Now this defendant had every incentive to minimize the number of pills because he was going to be sentenced based on what he said, and he in fact was. So again, the district court took a very conservative approach here. It was well-supported in the record. The court went to great lengths to summarize trial testimony in favor of it. This defendant received more than a reasonable sentence. This defendant received a lenient sentence. What about the leadership role enhancement? As the district court pointed out, that two-point enhancement was well-deserved because Mr. Rice, he owned the establishment. He was leasing. He was leasing. He was in control of the establishment. He provided the place where these raves took place, where the drug distribution took place, and he was not innocent with regard to the drug distribution. He was involved in the planning meetings concerning how the drugs were going to be to certain drug dealers to deal during these rave parties. Other people were searched to make sure they were not bringing drugs in. He received a cut of the amount of drugs that were distributed at the premises that he was leasing. So he was integrally involved at the management level, the planning level of these raves. One issue I think is also raised on the overall reasonableness of the 84-month sentence. Maybe I'm wrong about that, but I thought there was a general challenge to reasonableness under Booker, and if so, does that aspect of the decision have to be held until the court decides to end Bank Cardi and Zavala decisions? I do not believe so, Your Honor, and by the way, I'm the attorney on the Zavala case as well. I do not believe so because in this case there's not a Zavala issue. There's been no allegation here that the district court used the guidelines in some kind of a presumptive way. Of course, the initial suggestion was not raised initially. It's been this case has been sent back already under an Ammaline remand, so the district court has relooked at the case and said I would have given the same sentence even if I had known at the time that the guidelines were advisory. There's not a Zavala or a Cardi issue in this case as it's been raised. Okay. Thank you for your argument. Rebuttal, counsel? Thank you, Your Honor. I would agree with counsel that there is not a Zavala issue in this case, so I don't think we need to wait for the en banc decision in that. Maybe going a little bit backwards, on the scope of the conspiracy and the people counting out the pills and 4,000 here and so many there, this was not a single conspiracy. These people, Mr. Pollack and Mr. Nichols, Mr. Mary and Mr. Blair, they were selling drugs throughout the Treasure Valley. They were not just selling drugs at Mr. Rice's establishment. They would sell sometimes at Mr. Rice's. They would go down the street, sell at what was called the Quilted Bear Rave. They would go across town, sell at the Farmer Brown Raves. This is not a conspiracy distributed singly through Mr. Rice's establishment. So these counts, these numbers that Mr. Mary pleads up to, this 4,000 pill count, is based not on his activity only with Mr. Rice. It includes his other activity throughout the Treasure Valley. And I think that's important to keep in mind when you think of the number of pills. I think finally, if the government's correct to say that if we look at MDA and we must look at that mixture weight in order to determine what value we give for the dose weight, then application of note number 11 has no point because you use application of note 11 when you don't have the drugs. We didn't have the drugs here. It's the assumptions, it's the typical weight that we're using based upon the guidelines, not based upon any measured amount. And if it were MDA and we didn't have any of these pills, the weight would be 100. It would not be the 250 total weight, mixture weight because the application note 11 allows for that. Same situation here. We don't have the drug. We're making the calculation based upon the guidelines and application note 11 guides us. Note 11 doesn't give a weight for MDMA, does it? Correct. Correct, Your Honor. So how can it guide that? The guidance comes in using the application note 11 and using the MDA as an analogy. It is the closest one. It is tracked exactly the same as the guidelines continue and even the little asterisk in the application note 11 indicates we're using the actual weight, not the total weight.  And the MDA is the one that's most likely to guide us. Those are all my points, Your Honor. Thank you. Thank both counsel for their arguments. The case just argued will be submitted for decision.
judges: Hawkins, Silverman, Gould